IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELE MARSHALL, | : | CIVIL ACTION |
| individually and on behalf of her minor son | : | |
| | : | |
| | : | |
| | : | |
| v. | : | NO. 04-5801 |
| | : | |
| | : | |
| SISTERS OF THE HOLY FAMILY | : | |
| OF NAZARETH, t/a NAZARETH | : | |
| ACADEMY GRADE SCHOOL | : | |

### MEMORANDUM

O'Neill, J.[1]                                                                                                                October 31, 2005

      Michele Marshall, acting on behalf of herself and her minor son, asserts that the Nazareth Academy Grade School violated the Rehabilitation Act and the Americans with Disabilities Act when it refused to readmit her son because of his behavior and disciplinary problems. I conclude that the Rehabilitation Act does not apply to Nazareth Academy because it does not receive federal funding and that Title III of the ADA does not apply to the Academy because it is a religious institution. I also conclude that even if these statutes were applicable to Nazareth Academy, the Marshall boy's behavior problems do not constitute a "disability" under federal law. Accordingly, I will grant Nazareth's motion for summary judgment.

### LEGAL STANDARD

---

[1] This case was reassigned from Judge Diamond to me on October 11, 2005.

1

Upon motion of any party, summary judgment is appropriate "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must initially show the absence of any genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). An issue is material only if it could affect the result of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In deciding whether to grant summary judgment, the district court "must view the facts in the light most favorable to the non-moving party" and take every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265 (3d Cir. 2005). If, after viewing all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. See Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

Because a motion for summary judgment looks beyond the pleadings, factual specificity is required of the party opposing the motion. See Celotex, 477 U.S. at 322-23. To prevail, the opposing party may not simply restate the allegations made in its pleadings or merely rely upon "self-serving conclusions, unsupported by specific facts in the record." Id. The opposing party must support each essential element with concrete evidence in the record. See id. This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F.Supp. 2d 637, 641 (E.D. Pa. 2004) (restating Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976)).

In describing the background of this case, I have set out those record facts that plaintiff does not dispute and construed them in the light most favorable to plaintiff. In addition, both

parties have offered affidavits in support of their summary judgment papers. I have disregarded any "facts" set forth in an affidavit that contradict the affiant's deposition testimony. See Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991) (holding that unless an explanation is offered, when an affidavit and deposition by the non-moving party give conflicting accounts "the district court may disregard the affidavit in determining whether a genuine issue of material fact exists."). Finally, plaintiff repeatedly makes factual allegations without any evidentiary support. I have disregarded these allegations as well. See Celotex, 477 U.S. at 322-23; Jones v. UPS, 214 F.3d 402, 407 (3d Cir. 2000) (requiring more than "unsupported allegations" to defeat summary judgment).

## Background

A private co-educational Catholic school teaching grades one through eight, Nazareth Academy was founded in 1941 by the Congregation of the Sisters of the Holy Family of Nazareth, a religious community of nuns affiliated with the Roman Catholic Church. See *Defendant's Motion for Summary Judgment, Exhibit 3, Declaration of Sister M. Martin Duffy*, at ¶ 3. Nazareth Academy continues to be operated and controlled by the Sisters. Both entities are incorporated as Pennsylvania nonprofit corporations and their directors and officers are nuns. Id. at ¶ 3 - ¶ 4. The Sisters are exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986 and as a member of the Official Catholic Directory. Id. Nazareth Academy is also separately included in the directory. Id.

The Academy's mission, which is carried out by the Sisters, is to "create an environment of love that inspires each student to grow and develop his/her full potential. In imitation of the

Holy Family of Nazareth, Jesus, Mary, and Joseph, Nazareth Academy strives to spread the Kingdom of God's love by finding God in everyday life events." Id. at ¶ 5. The Academy also focuses "on the acquisition and practice of true Christian principles" in conjunction with its educational curriculum. *Plaintiff's Motion for Summary Judgment, App. of Documents, Nazareth Academy Brochure*. The fifth and sixth grade programs incorporate sacramental instruction, and students prepare a monthly eucharistic liturgy, celebrated by the entire student body. Id.

Nazareth participates in the national school lunch program, operated by a branch of the Archdiocese of Philadelphia. *Sister Martin Decl.* at ¶ 10. During 2002-03, the Program provided one student with a free lunch. Id.

In April 2002, the Academy admitted plaintiff's son, Jack, into the first grade for the 2002-2003 school year. *Def. Mot., Exhibit 4, Deposition of Michele Marshall*, at 39. Although Jack previously had attended another Catholic school for pre-kindergarten and kindergarten, plaintiff enrolled him at Nazareth Academy because she felt it would provide a challenging education for Jack's high level of intelligence. Id. at 39-40, 78-9.

During the 2002-2003 school year, plaintiff's son earned strong grades, consistently placing near the top of the class and exhibiting "no difficulty with learning." *Sister Martin Decl*. at ¶ 7. His teacher considered his academic performance to be "exceptional," and a corresponding medical evaluation reported that Jack's intellectual capacity fell within the superior range. *Hatzinikolaou Decl*. at ¶ 7; *Def. Mot., Exhibit 5, Report of Psycho-Educational Evaluation/Consultation by Dr. Barry L. Kayes*, at 7. Moreover, plaintiff herself noted that her son's strengths included excellent memory, ability to learn easily, math, spelling, computers, reading, art, assembling, and building. *Def. Mot., Exhibit 12, Cora Services, Inc., Parent Input*

4

*and Development History Questionnaire*, at 6. Plaintiff's husband observed that Jack's "grades were excellent." *Def. Mot., Exhibit 7, Deposition of Jon Marshall*, at 74.

Unfortunately, Jack was defiant in the classroom. *Sister Martin Decl*. at ¶ 7. His first grade teacher reported that his classroom conduct frequently fell below an acceptable level. *Def. Mot., Exhibit 6, Declaration of Angelique Hatzinikolaou*, at ¶ 3. For example, he often shouted out answers without being called on, and mocked other students for their mistakes. Id. See also *Pl. Resp*. at 12 (alleging that this behavior is what Jack "was unable to 'learn.'"). He also punched students and threatened a student with a pencil. Id. During her deposition, plaintiff confirmed that Nazareth Academy's principal repeatedly called to discuss Jack's misbehavior. Similarly, plaintiff's husband (Jack's father) testified that his son's behavior had been disruptive. See *Dep. of M. Marshall* at 117-18; *Dep. of J. Marshall* at 54-57.

The parents of other students made numerous verbal and written complaints to the teacher about Jack's behavior. See *Sister Martin Decl*. at ¶ 4. The teacher in turn spoke repeatedly with plaintiff, her husband, and Jack about Jack's unacceptable behavior and the need for improvement. Id. at ¶ 5. Plaintiff's husband met with the teacher after receiving Jack's report cards. *Dep. of J. Marshall* at 53. In addition, Sister M. Martin Duffy - the Academy's principal - also spoke with Jack and his parents regarding Jack's poor behavior. *Sister Martin Decl*. at ¶ 7. Jack's misbehavior nonetheless continued. See *Dep. of J. Marshall* at 56; *Hatzinikolaou Decl*. at ¶ 5.

After plaintiff's husband requested that the Academy test his son for intelligence, the principal suggested that Jack also be evaluated by Cora Services, Inc., a private testing institution, to determine why the child engaged in inappropriate behavior. *Sister Martin Decl*. at

5

¶ 7; *Dep. of M. Marshall* at 85.  Sister Martin felt that a Cora evaluation might help correct Jack's behavior problems. *Sister Martin Decl.* at ¶ 7. In February, 2003, Nazareth provided plaintiff with the paperwork required to perform a Cora evaluation, but plaintiff delayed in returning some of the forms until after the Academy informed her that it would not readmit Jack for the 2003-04 school year.  *Sister Martin Decl.* at ¶ 8.; *Dep. of M. Marshall* at 88-90. Thus, Cora never performed an evaluation of Jack. *Sister Martin Decl.* at ¶ 8.

In April, 2003, Sister Martin told Jack's father that the school would not re-admit Jack for the second grade. *Dep. of J. Marshall* at 32.  The father wrote letters  to Nazareth requesting Jack's readmission and threatened to take legal action against the school.  *Def. Mot., Exhibit 8, Letters from Jon Marshall of May 6, 2003 and Apr. 7, 2003.* In these letters, the father never suggested that Nazareth Academy based its decision on any disability.  Id.; *Dep. of J. Marshall* at 43.  Moreover, at no time during the school year did plaintiff suggest to the Academy that she thought her son had a learning disability. *Dep. of M. Marshall* at 72. Indeed, Jack's father testified that Jack's learning at Nazareth Academy was "not at all" affected by any disability. *Dep. of J. Marshall* at 75.

Following the 2002-2003 school year, plaintiff took Jack to a psychologist. *Dep. of M. Marshall* at 15.  The psychologist diagnosed Jack with attention deficit hyperactivity disorder ("ADHD"), but noted that his IQ test responses and scores placed him in a superior range of intelligence. *Kayes Evaluation* at 10. He also found that Jack had a tendency to engage in defiant behavior, as shown by the sentence completion item: "*When grown-ups tell me what to do*, 'I usually do not listen.'" Id. at 9. (Emphasis identifies the prompt for the sentence completion).

Jack has not had follow-up visits with the psychologist, and has not seen any other

medical professionals concerning his purported ADHD. *Dep. of M. Marshall* at 77-78. Jack has not received medication to treat his ADHD. Id. at 66-68. Since September, 2003, Jack has been enrolled in a parish grade school where he continues to excel academically. Id. at 12-13, 75. His behavioral problems at his new school have been limited to occasional "temper tantrum[s]" on "bad days." Id. at 95-6. The father testified that the new school has contacted them about disciplinary problems much less frequently than Nazareth Academy. *Dep. of J. Marshall* at 78-80.

On December 14, 2004, plaintiff filed suit individually and on behalf of her son against Nazareth Academy in the Philadelphia Common Pleas Court, asserting claims under the Individuals With Disabilities Education Act, the Rehabilitation Act, and the ADA, as well as common law claims for breach of contract, verbal contract, and intentional tort. Nazareth timely removed to this Court.

After Nazareth moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), plaintiff's counsel conceded that the "IDEA [claim] should not be in this case.... IDEA does not apply at all." *Tr. of Jan. 26, 2005 Hearing on the Motion to Dismiss* at 3, 6. Accordingly, plaintiff's IDEA claim was dismissed by my colleague, Judge Diamond, the judge then assigned to the case. He also dismissed plaintiff's "intentional tort" claim because such a cause of action does not exist in Pennsylvania law. See Order of Jan. 27, 2005, in CIV. No. 04-CV-5801 (citing Utz v. Johnson, CIV. No. A 04-CV-0437, 2004 WL 136824 (E.D. Pa. June 16, 2004), D'Errico v. DeFazio, 763 A.2d 424, 433 (Pa. Super. Ct. 2000), West Coast Franchising Co. v. WCV Corp., 30 F. Supp. 2d. 498 (E.D. Pa. 1998)). At oral argument, plaintiff's counsel could not define the "intentional tort" or identify its purported elements. See *Tr. of Jan. 26, 2005 Hearing* at 8-9.

Plaintiff based her breach of a written contract claim on the Academy's purported failure "to follow its own disciplinary rules." *Complaint* at ¶ 76. Judge Diamond dismissed her claim because those rules could not possibly constitute an enforceable contract. See *Jan. 27, 2005 Order* at ¶ 3 (citing Gazarov v. Diocese of Erie, 80 Fed. Appx. 202, 206 (3d Cir. 2003)).

Finally, plaintiff based her breach of "verbal contract" claim on highly conditional statements purportedly made by Sister Martin – the Academy's principal – that Jack might be re-admitted for the 2003-04 academic year. Judge Diamond held that as a matter of law plaintiff had failed to identify an enforceable contract. Id.

The parties proceeded to take discovery as to plaintiff's claims under the Rehabilitation Act and the ADA and subsequently filed cross-motions for summary judgment.

**DISCUSSION**

**I.  Count II: Section 504 of the Rehabilitation Act**

Plaintiff alleges that Nazareth Academy refused to re-enroll her son because of his alleged disability, thus violating Section 504 of the Rehabilitation Act. Plaintiff is not entitled to relief, however, unless she can first show that the Rehabilitation Act applies to her claim: she must show that the alleged discrimination is in a "program or activity" receiving "federal financial assistance." 29 U.S.C. § 794(a) (2004). She must then show that: (1) her son is an individual with a disability under the Act; (2) is "otherwise qualified" for the program sought, or would be qualified if the defendant made reasonable modifications to the program; (3) was excluded from the program "*solely* by reason of [his] disability"; and (4) the program or activity in question

8

receives federal financial assistance.  See 29 U.S.C. § 794(a) (2004) (emphasis added); see also Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1009 (3d Cir. 1995); Strathie v. Department of Transp., 716 F.2d 227, 230 (3d Cir. 1983); Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir. 1991). In my view, plaintiff cannot show either that the Rehabilitation Act applies to Nazareth Academy or that Jack was disabled under federal law.

**A. Applicability of the Rehabilitation Act**

Plaintiff alleges that because Nazareth Academy and the Sisters of the Holy Family of Nazareth receive federal funding, the Rehabilitation Act applies to them. Without citing to any record evidence, plaintiff first argues that the Sisters receive federal funding in the form of scholarships to undergraduates at Holy Family University.  Plaintiff argues that under Grove City v. Bell these purported University scholarships confer federal jurisdiction of plaintiff's claims against the Nazareth Academy Grade School. 465 U.S. 555 (1984).  In fact, Grove City supports the opposite conclusion. The Grove City Court examined the effect of Title IX language "prohibit[ing] sex discrimination in 'any education program or activity receiving Federal financial assistance.'" Id. at 557 (quoting the then-current version of 20 U.S.C. § 1681(a)). The Supreme Court held that this language created spending conditions only as to the specific "program or activity" receiving the funding. Id. at 574-75. The language of the Rehabilitation Act mirrors the language interpreted in Grove City: the Act's requirements apply to a "program or activity receiving Federal financial assistance." 29 U.S.C. §794.

In response to Grove City, Congress amended Title IX to apply institution-wide rather than only to individual programs or activities. See Cureton v. NCAA, 198 F.3d 107, 115

9

(3d Cir. 1999) (holding that certain regulations under Title VI of the Civil Rights Act of 1964 applied only to individual programs and activities). Significantly, Congress has not similarly amended the language in the Rehabilitation Act. Thus, the Court's reasoning in Grove City remains persuasive: any funding conditions are limited only to the specific programs and activities receiving funding. Cf. Johnson v. Transportation Agency, 480 U.S. 616, 629 (1987) ("Congress has not amended the statute to reject our construction... and we therefore may assume that our interpretation was correct.").

It is undisputed that Nazareth Academy Grade School itself receives no federal scholarships. Rather, plaintiff alleges that Holy Family University alone receives that type of federal funding. *Pl. Mot*. at 11. Even if there were evidence to support this allegation, plaintiff's argument would still fail. Under Grove City, financial aid to Holy Family University cannot extend the protections of the Rehabilitation Act to the Grade School. There is nothing in the record suggesting that the University and the Grade School are part of the same "program or activity."

In addition, plaintiff contends that Nazareth Academy "receives Federal Funding through the National School Lunch Program." *Pl. Resp*. at 17. The Academy admits that it "participates" in the program but argues that this does not "constitute federal financial assistance." See *Sister Martin Decl.* at ¶ 10.  The record shows that only "one student received a free lunch," and that the Academy received no proceeds from the sale. Id. Plaintiff has not provided any evidence to contest these facts, providing only information from a brochure that describes the program in general terms. See *Pl. Resp*. at 17-18.

In deciding whether Nazareth Academy is a recipient of federal financial assistance, I

conclude the Academy does not achieve that status by receipt of some small amount of material aid purchased by a third party with federal funds. See Bercovitch v. Baldwin Sch., Inc. 133 F.3d 141, 152 (1st Cir. 1998) (discussing whether the disbursement of a small amount of educational computer material purchased by a U.S. territory with federal funds met the "financial assistance" standard). The provision of a free lunch to a single student over the course of a year is de minimis – too little to alter my conclusion that the Academy does not receive federal financial assistance for purposes of the Rehabilitation Act. Cf. Buckley v. Archdiocese of Rockville Centre, 992 F. Supp. 586, 589 n.5 (declining to extend Title IX protections to a Catholic high school based on the indirect provision of $1,600 of instructional materials).

### B.  Plaintiff's Son is Not "Disabled."

Even if the Rehabilitation Act applied to Nazareth Academy, plaintiff must also establish that her son is an "individual with a disability" under the Rehabilitation Act. 29 U.S.C. § 794(a). She must thus demonstrate that Jack has (i) "a physical or mental impairment which substantially limits one or more major life activities," (ii) "a record of such an impairment," or (iii) been "regarded as having such an impairment" by defendants. See 29 U.S.C. §§ 705(9), 705(20(b)). In my view, plaintiff has produced no evidence that Jack is disabled. See Liberty Lobby, 477 U.S. at 265.

**There is no impairment that substantially limits a major life activity.**

Plaintiff alleges that Jack is disabled because he cannot "concentrat[e] on behaving himself in class," or "learn[] to be a useful human being." I disagree. A general cognitive

function may constitute a "major life activity" that satisfies the disability standard.  See Taylor v. Phoenixville, 184 F. 3d 296, 307 (3d Cir. 1999) (holding "thinking" to be a major life activity); Gagliardo v. Connaught Labs., 311 F.3d 565, 569 (3d Cir. 2002) (holding "concentrating" and "remembering" to be major life activities); see also 34 C.F.R. 104.3 (j) (defining learning as a major life activity). At the same time, limits on a person's ability to think, remember, or learn must still rise to the "substantially limit[ing]" threshold to qualify a person as disabled. See, e.g., Collins v. Prudential Inv. & Ret. Servs., No. 03-2356, 2005 WL 19466, at *5 (3d Cir. Jan. 4, 2005) (stating that "[h]ealth conditions that cause moderate limitations on major life activities do not constitute disabilities under [federal disability law]").

Other courts have concluded that a student who learns as well as the average student does not have an impairment that substantially affects the major life activity of learning.  See Bercovitch v. Baldwin Sch., 133 F.3d 141, 155-56 (1st Cir. 1998) (no disability where student's achievement is "consistently above average"); Wong v. Regents of the Univ. of Cal., 379 F.3d 1097, 1108 (9th Cir. 2004) (finding that a "claim to be 'disabled' is fatally contradicted by his ability to achieve academic success, without special accommodations"). Similarly, a student is not substantially impaired if his disability affects only one aspect of his education; rather, "[t]he impairment must limit learning generally." Knapp v. Northwestern University, 101 F.3d 473, 481 (7th Cir. 1996).

Plaintiff contends that her son's ADHD substantially limited his major life activities of learning, concentrating, and remembering. See *Pl. Resp.* at 11.  Yet the evidence shows just the opposite:  he earned grades consistently at or near the top of his class, and he exhibited no difficulty with learning during the 2002-2003 school year. See *Sister Martin Decl.* at ¶ 7.  Indeed,

plaintiff and her husband conceded that Jack's "disability" did "not at all" affect his academic performance. *Dep. of J. Marshall* at 75; see also *Dep. of M. Marshall* at 74 (testifying that her son's grades were "excellent," with most scores 95 or above).

Plaintiff offers no authority suggesting that an "impairment" in Jack's ability to "concentrat[e] on behaving himself in class" is a disability under the Rehabilitation Act. Rather, plaintiff offers cases that describe across-the-board impairment of mental activity. See Phoenixville, 184 F.3d 296, 307-08 (describing the paranoid delusions that supplanted plaintiff Taylor's ordinary thought processes); Gagliardo, 311 F.3d 565, 570 (describing how plaintiff Gagliardo's difficulties in remembering, concentrating, and focusing extended across many contexts and situations).

In addition, plaintiff's suggestion fits poorly within the frame of other major life activities set forth in the Rehabilitation Act and interpretive regulations. Plaintiff correctly quotes these regulations, observing that "[m]ajor life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 34 C.F.R. 104.3(2)(ii); *Pl. Resp*. at 10. The major life activities of "thinking" and "remembering," as set forth by the Court of Appeals, comport well with this list. "Behaving himself in class," in contrast, describes a much narrower function than any of the activities on the list. Compare Knapp at 481 ("An impairment that interferes with an individual's ability to perform a particular function, but does not significantly decrease that individual's ability to obtain a satisfactory education otherwise, does not substantially limit the major life activity of learning."). In short, plaintiff asks me to transform civility and decorum into a "major life activity" under the Rehabilitation Act. This I will not do. Cf. Soileau v. Guilford of Maine, 105

F.3d 12, 15 (1st Cir. 1997) ("observing that [t]he concept of 'ability to get along with others' is remarkably elastic, perhaps so much so as to make it unworkable as a definition.").

Finally, even if I were to rule that Jack's poor behavior constituted a "major life activity," the record evidence falls far short of demonstrating that Jack was substantially impaired in his ability to "control his behavior." Both plaintiff's own testimony and that of her husband describe their use of "positive reinforcement" and "rewards" as a technique through which Jack has learned to behave himself better. See *Dep. of M. Marshall* at 67-68, 76 (describing behavioral modification techniques); *Dep. of J. Marshall* at 78-80 (describing improvement in son's behavior at new school). Thus, plaintiff and her husband have themselves confirmed that his "impairment" is not "substantial," but, at most, "moderate." See Mondzelewski v. Pathmark Stores, 162 F.3d 778, 784 (3d Cir. 1998) (emphasizing that a "substantial" limitation is one that results in more than a moderate departure below average performance).

**Nazareth Academy did not "regard" Jack as having an impairment.**

Alternatively, plaintiff could establish that her son is a person with a disability by showing that Nazareth regarded Jack as having a substantially limiting impairment. See Dorn v. Potter, 191 F. Supp. 2d 612, 625 (E.D. Pa. 2002) (citing Tice v. Centre Area Trans. Auth,, 247 F.3d 506, 514 (3d Cir. 2001).  To prevail under this theory, plaintiff must demonstrate either that "the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities... or has a nonlimiting impairment that the employer mistakenly believes limits major life activities." Tice, 247 F.3d at 514.  Considering the evidence most favorably for the plaintiff, no reasonable fact-finder could conclude that Nazareth Academy "regarded" plaintiff's

14

son as having a disability.

First, plaintiff alleges that Nazareth Academy "regarded" Jack as having "Asbergers [sic] Syndrome." See *Pl. Resp*. at 12. Yet, Jack's father testified that Sister Martin "never talked about [Jack] having any disability whatsoever." *Dep. of J. Marshall* at 20. Nor does the Academy's request for psychological testing show that Nazareth "regarded" Jack as disabled. See *Pl. Resp*. at 12; Tice, 247 F.3d at 515 (holding that "a request for... an appropriately-tailored examination" is insufficient to demonstrate that a person is "regarded as" having a disability).

Plaintiff's other factual assertions are little more than a recitation of the unproven allegations made in her Complaint. For example, plaintiff observes that Jack's teacher talked about his disruptive behavior, and notes that this behavior is a symptom of ADHD. See *Pl. Resp. at 12*. Similarly, plaintiff relies on a few remarks about the "possibility" of a disability and the presence in the classroom of a teacher with a special-education background. This evidence, at best, shows that Nazareth Academy considered the existence of a disability as one potential explanation of the child's behavior. Yet, as the Court of Appeals has held, "doubts alone do not demonstrate that the [person] was held in any particular regard." Tice at 515. The Court's reasoning is compelling: any other holding would impose liability on a school simply because it sought to determine the cause of a student's problems.

In these circumstances, the record shows quite clearly that Nazareth learned of Jack's purported disability (his as-yet untreated ADHD) *after* it decided not to re-enroll him. Accordingly, plaintiff has demonstrated, at most, "the mere existence of a scintilla of evidence" to support a "regarded as" claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 265 (1986). This failure to create a genuine issue of material fact on the issue of disability also compels

dismissal of plaintiff's Rehabilitation Act claim.

**II. Plaintiff's ADA Claim**

Title III of the ADA protects individuals with disabilities from discrimination in public accommodations. See 42 U.S.C. §12181 et seq. Title III's protections and definitions closely mirror those in the Rehabilitation Act, raising similar issues. McDonald v. Commonwealth of Pa., Dept. of Pub. Welfare, 62 F.3d 92, 95 (3d Cir. 1995). Although Title III's applicability is not limited to programs or activities receiving federal financial assistance, it does contain an explicit exemption for "religious organizations." Compare Part I.A., supra; 42 U.S.C. § 12187. As I find that Nazareth Academy qualifies for the religious exemption and that plaintiff cannot demonstrate a disability, I will grant summary judgment in Nazareth's favor.

**A. Nazareth Academy is exempt from Title III.**

The ADA explicitly exempts "[r]eligious organizations or entities controlled by religious organizations." 42 U.S.C. § 12187. This exemption "is very broad... [e]ven when a religious organization carries out activities that would otherwise make it a public accommodation, the religious organization is exempt from ADA coverage." 28 C.F.R. Part 36, Appendix B (interpreting the statutory exemption). Religious entities do not lose the exemption "merely because [] services provided [are] open to the general public." Id. Nor does the use of "lay boards [or] other secular or corporate mechanisms to operate schools" remove them from the exemption. Id. Thus, a private school that is owned and operated by a religious organization, adheres to Quaker principles, and requires weekly Quaker meetings is exempt from the ADA.

16

See <u>Doe v. Abington Friends Sch.</u>, No. 04-4647, U.S. Dist. LEXIS 1684 (E.D. Pa. Feb. 4, 2005); <u>White v. Denver Seminary</u>, 157 F. Supp. 2d 1171, 1173 (D. Colo. 2001) (granting exemption to a religious organization with a mandatory religious curriculum and weekly ceremonies).

Seeking to distinguish these decisions, plaintiff argues principally that only "a church" qualifies under Title III as a "religious organization." *Pl. Resp.* at 9. The regulations promulgated in accordance with the ADA provide, however, that the exemption applies not only to churches, but to other religious organizations. 28 C.F.R. Part 36, App. B ("The test is whether the church <u>or other religious organization</u> operates the public accommodation.") (emphasis added).

The evidence plainly shows that the Nazareth Academy is a religious organization or entity controlled by a religious organization. Nazareth Academy describes itself as a "Catholic school." *Sister Martin Decl.* at ¶ 3. It is undisputed that the Academy's mission is "to create an environment of love that inspires each student to grow and develop to his/her full potential. In imitation of the Holy Family of Nazareth, Jesus, Mary, and Joseph, Nazareth Academy strives to spread the Kingdom of God's love by finding God in everyday life events." *Sister Martin Decl.* at ¶ 5. Plaintiff acknowledges that the Academy's curriculum includes "Bible study classes," <u>see</u> *Dep. of M. Marshall* at 33, and that Nazareth focuses "on the acquisition and practice of true Christian principles." <u>See</u> *Pl. Mot. for Summary Judgment, Appendix of Exhibits, Nazareth Academy Brochure*. Moreover, Nazareth Academy is solely operated and controlled by the Sisters of the Holy Family of Nazareth, which is the "civil law embodiment" of a canon law religious community. *Sister Martin Decl.* at ¶ 4. The Sisters are a religious community

composed of Roman Catholic nuns, are listed in "The Official Catholic Directory," and derive their 501(c)3 tax exemption in part from their association with the Roman Catholic Church. Id.

Plaintiff does not contest these facts, concentrating instead on other facts to conjure a nonexistent material dispute. Plaintiff states that Nazareth Academy competes with private, non-parochial schools, that advertisements for "Holy Family University" do not explicitly mention religion, that the Academy employs lay teachers, and it is not "subject to the rules of the Archdiocese." *Pl. Resp*. at 7-8. Yet the regulations provide that Title III's religious exemption is "broad," that lay "mechanisms" do not defeat the exemption, and that religious organizations may offer services "to the general public." 28 C.F.R. Part 36, App. B.

Without offering any supporting authority, plaintiff argues that the exemption does not apply to a defendant that provides a "fee based service." See *Pl. Resp.* at 7. Rather, relying on decisions involving private, non-religious schools, plaintiff contends that "[d]efendants sell education, not religion," and that applying the exemption to Nazareth would unjustifiably exempt any entity simply because it was "founded by religious individuals." *Pl. Resp*. at 9-10; *Pl. Mot*. at 12. Plaintiff thus appears to argue that I should not apply the religious exemption to Nazareth Academy because the school performs some of the same functions as non-religious organizations. Plaintiff's argument would thus dramatically limit - if not outright eliminate - the exemption's applicability. Whatever the merits of this dubious argument, it is more properly made not to me but to Congress, which has certainly concluded otherwise. See 42 U.S.C. §12187.

### B. Jack Is Not "Disabled."

18

The ADA and Rehabilitation Act "have closely parallel definitions of disability." McDonald, 62 F.3d at 95. In particular, Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodations." 42 U.S.C. §12182(a). The regulations promulgated under the ADA define disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 28 C.F.R. Part 36.104.

In light of these parallel definitions, the Court of Appeals applies the same substantive standards to determine liability under comparable provisions of the ADA and the Rehabilitation Act. See Doe v. County of Centre, 242 F.3d 437, 446 (3d Cir. 2001) (holding that "the protections found in the ADA and in the Rehabilitation Act are interpreted similarly... except where necessary, we refer only to Title II of the ADA, with the understanding that both statutes are implicated"); McDonald at 94 (observing that "Congress made clear its intention that identical standards were to be applied to both Acts"); Mihalko v. Potter, 2003 U.S. Dist. LEXIS 24825 at *37 (W.D. Pa. 2003) ("The standards defining a "disability" under the ADA are the same as those under the Rehabilitation Act."). Because I concluded that plaintiff's son was neither disabled nor "regarded as" disabled under the Rehabilitation Act, I reach the same result with respect to plaintiff's ADA claim.

I will grant Nazareth Academy's motion for summary judgment and deny plaintiff's motion.